1  ANTHONY E. PAGKAS, State Bar No. 186112
   CHRISTOPHER J. D'ANJOU, State Bar No. 234299
2  **PAGKAS & D'ANJOU, LLP**
   777 North 1st Street., Suite 250
3  San Jose, CA 95112
4  Telephone: (408) 291-5401
   Fax: (408) 291-5302
5
   Attorneys For Creditors
6  ARDESHIR SALEM, an individual and A. SALEM D.D.S., INC.,
7  A California Corporation

## UNITED STATES BANKRUPTCY COURT,

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: JINNIE JINHUEI CHANG CHAO<br><br>Debtor | BK Case No.: 15-31519<br>Adversary Case No.<br>Chapter 11 |
| ARDESHIR SALEM, an individual, and A. SALEM D.D.S., Inc., A California Corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>JINNIE JINHUEI CHANG CHAO, and DOES 1-50, inclusive.<br><br>Defendants. | **COMPLAINT TO DETERMINE DISCHARGEABILITY AND OBJECTION TO DISCHARGE** |

ARDESHIR SALEM, an individual, and A. SALEM D.D.S., Inc., a California Corporation (collectively "SALEM" or "Plaintiffs") and creditors to the above-named defendant/debtor JINNIE JINHUEI CHANG CHAO ("Defendant" or "CHAO") hereby alleges as follows:

### JURISDICTION

1. Plaintiffs are creditors of the debtor CHAO. At the time CHAO filed her Chapter 11 Bankruptcy petition on or about December 4, 2015, Plaintiffs had pending claims against her in the matter

- 1 -
COMPLAINT TO DETERMINE DISCHARGEABILITY AND OBJECTION TO DISCHARGE

entitled *Chao v. A. Salem, et al.*, Santa Clara County Superior Court Case Nos. 112CV217465 (Lead Case) and 115CV275589 (Consolidated Case). Said claims included claims for conversion/embezzlement, money had and received, restitution and unjust enrichment, conspiracy, violations of RICO, fraud, injunctive relief, fraudulent concealment, and accounting amongst others. CHAO obtained a 1.4 million dollar default judgment against A. Salem, D.D.S., Inc. (after its attorneys withdrew from the case) only in the lead case, but Ardeshir Salem's claims against CHAO continued. A. Salem, D.D.S., Inc.'s claims against CHAO were refiled under the consolidated case and incorporated into the lead case.

2. This is an adversary proceeding in debtor's case no. 15-31519 under Chapter 11 of the United States Bankruptcy Code, now pending in this Court. This Court has jurisdiction over the adversary proceeding pursuant to 11 U.S.C. §§ 727 and 523. This is a core proceeding under 28 U.S.C. §157(b)(2)(I) and (J).

3. Plaintiffs allege that Defendant/debtor CHAO is not eligible for a discharge as debtor in her bankruptcy action pursuant to 11 U.S.C.§§ 523 (a)(2)(A) and (a)(4).

## PARTIES

4. Plaintiff ARDESHIR SALEM is a natural person and a licensed dentist in the State of California.

5. Plaintiff A. SALEM, D.D.S., INC., is a corporation duly licensed under the laws of the State of California with its principal place of business in Santa Clara County, California.

6. Defendant/debtor is a natural person. On or about December 4, 2015, defendant/debtor CHAO filed for relief under Chapter 11 of the United States Bankruptcy Code. At all relevant times alleged in this complaint, Defendant/debtor has committed the acts, caused others to commit the acts, ratified the commission of the acts, or permitted others to commit the acts alleged in this

complaint and has made, caused or ratified, or permitted others to make the untrue or misleading statements alleged in this complaint.

7. Plaintiffs are not aware of the true names and capacities of the defendants sued herein as DOES 1--50, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiff swill amend this complaint to allege their true names and capacities when ascertained. Plaintiffs allege that each of these defendants was the agent, principal, partner, joint venturer, and/or employee of each of the remaining defendants and in doing the acts and omissions alleged in this complaint, each was acting within the course and scope of said agency, venture, and employment, and each defendant authorized and ratified the acts of each other defendant. Plaintiff s further allege that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that plaintiff's injuries, herein alleged, were proximately caused by the negligence or intentional acts of these defendants.

## FACTUAL ALLEGATIONS

8. In or around 2005, CHAO became a patient of Dr. Ardeshir Salem, a licensed dentist who worked at A. Salem, D.D.S., Inc., a dental corporation. CHAO's treatment required multiple visits such that over time, Dr. Salem and Ms. Chao became friends and would routinely discuss their respective business and personal lives during CHAO's visits to the dental office. Ms. Chao began to exploit her knowledge of Dr. Salem's spiritual and religious beliefs as part of a gradual process of gaining Dr. Salem's trust and enmeshing herself fully into the dental business and personal affairs of Dr. Salem in furtherance of her scheme to defraud SALEM.

9. Through their friendship, and in or around 2006, CHAO learned that Dr. Salem was investing in a business called Rejuv Clinic of Los Altos, Inc. ("Rejuv"). Rejuv was a clinic that provided beauty and anti-aging services such as Botox, photo facials, peels, and microderm abrasion to its patients.

Dr. Salem told CHAO that he planned to open Rejuv in the office space immediately next door to his dental office. After learning more about Rejuv, CHAO asked Dr. Salem if she could invest in the business venture. Dr. Salem told Ms. Chao that she would become a $100,000 investor in Rejuv. On or about April 27, 2006, Ms. Chao wrote a check in the amount of $100,000 from an entity called Wiz Corporation ("Wizcorp") to Rejuv. The entire amount was deposited into the Rejuv bank account.

10. Plaintiffs are informed and believe, and on that basis allege that at all times relevant to this complaint, there existed a unity of interest and ownership between Wizcorp on the one hand and CHAO, on the other hand such that any individuality and separateness between CHAO and Wizcorp has ceased, and that Wizcorp is the alter ego of CHAO. Plaintiffs are informed and believes, and on that basis allege that Wizcorp is a mere shell and sham without capital, assets, stock or stockholders and that CHAO uses Wizcorp as a device to avoid individual liability and for the purpose of hindering, delaying and defrauding CHAO's creditors or future creditors.

11. Furthering her efforts to enmesh herself with Dr. Salem, in or around early 2007, Ms. Chao offered to manage the day to day operations of Rejuv. Ms. Chao, now a Rejuv investor, managed Rejuv until June 2007 when the business failed and Rejuv Clinic of Los Altos, Inc. was dissolved and the business closed. Both Dr. Salem and Ms. Chao lost their investments in Rejuv.

12. After Rejuv closed, the business space next to SALEM's dental office opened up. At that time, SALEM owned the building where the dental practice was located and where the Rejuv business formerly operated. CHAO approached SALEM and asked if she could use the space formerly occupied by Rejuv to run her real estate brokerage. SALEM agreed to letting CHAO use the space rent free for a year and a half, based in part in their friendship, and based in part on fact that both parties lost their investments in Rejuv.

13. After CHAO set up her real estate brokerage office in the space next door to the SALEM dental office, she began routinely visiting with Dr. Salem and SALEM'S staff at the dental office. Through her visits, CHAO learned that SALEM was looking for ways to grow his practice. CHAO offered to help Dr. Salem market his dental practice, without charge. Ms. Chao touted her own experience and credentials and stated that she had significant experience marketing her business on the web. Ms. Chao offered to help Dr. Salem with his marketing efforts and represented to him that she had extra time on her hands, was not seeking any form of financial compensation, wanted to help out a friend and merely wanted an opportunity to learn more about running a dental practice. Based on these representations by CHAO and SALEM's previous consideration to provide free rent, SALEM agreed to allow CHAO to provide her assistance at no charge.

14. CHAO continued to routinely visit the SALEM office and enmesh herself with the SALEM dental practice. CHAO represented that she was mainly going to assist in marketing efforts through websites and and company called ChrisAd, a dental marketing and practice management company. At the same time, CHAO and Dr. Salem discussed other ventures outside of the SALEM dental practice, including teaching opportunities and working in overseas orphanages in China. Based on their friendship, and CHAO's representations of assistance, SALEM acquiesced in allowing CHAO assist in various ways with the SALEM dental practice, including some administrative tasks.

15. Over time, CHAO unilaterally began slowly taking on more and more responsibility in the dental office, which in turn gave Ms. Chao an increasing amount of access to SALEM's affairs. Ms. Chao sabotaged Dr. Salem's relationship with his office employees, then convinced him to fire them or made the environment so unpleasant that they quit. SALEM acquiesced in CHAO's

ongoing assistance based on her continued representations of marketing assistance, and that she was merely assisting her friend. Unbeknownst to SALEM, CHAO was eventually able to obtain exclusive access to the records of the dental office and was able to thoroughly infiltrate and entrench herself in various other aspects of the SALEM business and Dr. Salem's personal life. CHAO represented that she should have signature authority on the SALEM bank accounts as Dr. Salem would be traveling extensively. SALEM provided CHAO with what he believed was limited signature authority on a SALEM bank account at Heritage Bank, and based on CHAO's representations that she would help him while he traveled.

16. While CHAO perpetuated her scheme of marketing assistance and friendship to SALEM, she obtained a durable power of attorney without the consent of SALEM on or about April 19, 2007. The durable power of attorney gave CHAO the authority to act as SALEM's agent in fact for real property transactions and banking and other financial institution transactions. SALEM did not sign the power of attorney. Although the power of attorney purports to have Dr. Ardeshir Salem's signature, and represents to have been notarized by V. Fellowes, notary commission # 1335382, it would have been impossible for SALEM to sign it because he was not in the United States when the document was purportedly signed on April 19, 2007. Moreover, on February 4, 2015, CHAO admitted under penalty of perjury in deposition testimony that she in fact signed the power of attorney, and not SALEM.

17. Not satisfied with one power of attorney, CHAO obtained two other power of attorneys dated February 14, 2008 and January 11, 2012 respectively. These power of attorneys were never signed by SALEM, and the gave CHAO broad powers over the financial affairs of SALEM.

18. During the time that CHAO obtained these power of attorneys, she engaged in a scheme to embezzle and convert significant sums of monies from SALEM for her own personal use. This

included but was not limited to embezzlement of monies earned from the SALEM dental practice, but monies that Dr. Ardeshir Salem had been personally saving for his retirement.

19. During the same time that CHAO was fraudulently obtaining the first power of attorney, in or around October 2007, CHAO introduced Dr. Salem to her friend Tajo Chu. At that time Mr. Chu was a registered investment advisor with Investment Advisors International. CHAO represented herself as Dr. Salem's business partner to Mr. Chu. Almost a year later, in or around August, 2008, Dr. Salem met with Mr. Chu again. CHAO accompanied Dr. Salem at this meeting, this time representing that she was Dr. Salem's office manager. During this meeting, Dr. Salem disclosed that he had approximately $700,000.00 in his retirement accounts at Morgan Stanley Smith Barney, and was merely exploring his retirement options. Mr. Chu made representations that he was licensed to introduce clients to investment advisory service offered by third party money managers, including Foxhall Capital Management ("Foxhall"), Flexible Plan Investments ("Flexible") and Hanlon Management ("Hanlon"). After several meetings with Mr. Chu, and at the urging of CHAO, Dr. Salem transferred his retirement accounts with Morgan Stanley to Foxhall and its trading platform TD Ameritrade.

20. Plaintiffs are informed and believes, and on that basis allege that once the retirement accounts were transferred to the TD Ameritrade Account, CHAO facilitated transfers out of the TD Ameritrade account through forged documentation where she signed Dr. Salem's signature between October 15, 2009 and May 13, 2012 . This caused the amount of at least $730,000.00 to be transferred to a Heritage Bank Account owned by SALEM, but to which CHAO had obtained signature authority. SALEM did not authorize these transfers, and the fact of these transfers were concealed from SALEM by Chao because she was systematically intercepting SALEM's mail and correspondence, and embezzling said funds for her own personal use.

21. CHAO embezzled and converted monies from the SALEM bank accounts for her own personal use by *inter alia*:

   a) Converting the SALEM monies to pay her own personal legal fees to Michael Allen Law Group of at least $116,266.33;

   b) Converting the SALEM monies to pay and benefit her own corporation Wizcorp the sum of at least $58,000.00 when said corporation did not provide any benefits to SALEM;

   c) Converting the SALEM monies and giving them to her son Justin Chao in the sum of at least $49,850.00. Justin Chao was complicit in the scheme and readily and knowingly accepted monies drawn from the SALEM accounts;

   d) Converting the SALEM monies and giving them to her son Jonathan Chao in the sum of at least $3,500.00. Jonathan Chao was complicit in the scheme and readily and knowingly accepted monies drawn from the SALEM accounts;

   e) Converting SALEM monies to pay her own personal mortgage on her residence located at 30 Pilarcitos Court, Hillsborough, CA (which is a listed asset of CHAO's chapter 11 bankruptcy petition) in a sum of at least $131,404.08;

   f) Converting SALEM monies to pay her personal mortgage on other real property through Wachovia Mortgage in a sum of at least $44,231.28;

   g) Converting SALEM monies to pay her personal mortgage on other real property through Flagstar Bank in a sum of at least $19,090.99;

   h) Converting SALEM monies to pay her country club fees for her real property located in Pinehurst, North Carolina in a sum of at least $2,662.70;

   i) Converting SALEM monies to pay her personal CPA in a sum of at least $1,800.00;

   j) At no time did SALEM ever consent to CHAO using these monies.

22. Plaintiffs are informed and believe and on that basis allege that CHAO converted in excess of $1.4 million dollars of SALEM monies for her own personal use, which Plaintiff intend to prove at trial. CHAO concealed this facts from SALEM and falsely represented that she would assist him in various ways with the SALEM practice. These representations were in fact false, as CHAO used these representations to gain access to the SALEM dental practice and embezzle monies from it.

23. As a further proximate cause of CHAO transferring SALEM's retirement accounts and siphoning said monies to her, SALEM has incurred substantial tax penalties and lost numerous investment opportunities.

24. In or around January 12, 2012 SALEM (just after CHAO obtained another phony power of attorney over SALEM) SALEM banned CHAO from ever entering the SALEM office ever again. In or around this time, SALEM had become increasingly suspicious of CHAO and confronted her about his retirement accounts, amongst other things. Notwithstanding CHAO's banishment, SALEM returned to the SALEM office after the weekend to discover that the locks had been changed and many computers were missing. SALEM discovered several secret email GMAIL accounts bearing some form of the SALEM name that he never created. SALEM is informed and believes and on that basis alleges that CHAO changed the locks and removed items from the SALEM office in an attempt to conceal and hide her malfeasance and misdeeds. SALEM is also informed and believes, and on that basis alleges that CHAO used the secret GMAIL accounts to further her scheme of malfeasance and fraud.

25. After CHAO was banned from the SALEM office, SALEM noticed that mail was missing. SALEM confronted his postman, who informed SALEM that most of the mail was in a P.O. Box located at the main post office located in Los Altos, CA. SALEM was completely unaware of

having a P.O. Box as he never authorized one. SALEM went to the P.O. Box and was informed by the postmaster that he could not access it because it was registered to CHAO. The P.O. Box and use of U.S. Mail were some of CHAO's methods to divert monies from SALEM and conceal her misdeeds from SALEM. SALEM provided additional documentation to the Postmaster that eventually enabled him to access the P.O. Box.

26. After accessing the P.O. Box, and the mail therein, SALEM learned of correspondence from Wells Fargo Bank and Chase Bank addressed to A. SALEM, D.D.S, Inc. SALEM had always maintained its business bank accounts at Heritage Bank. Thus, SALEM was suspicious of accounts at Wells Fargo that were in the name of the corporation. SALEM went to a Wells Fargo branch and learned that the account ending in 7946 amongst others was in fact in the name of A. SALEM, D.D.S., Inc., but CHAO was the only person with signature authority. SALEM discovered that monies of SALEM were deposited into these accounts. SALEM is informed and believes, and on that basis alleges that CHAO used the fraudulent powers of attorney to open the Wells Fargo accounts, as well as to obtain signature authority. Later, SALEM learned that monies in this Wells Fargo account were used to pay CHAO's personal mortgages for real property owned by her amongst other things.

27. SALEM also learned that CHAO had opened a Chase Bank account around January, 2012 in the name of the SALEM corporation, and that monies from SALEM were deposited into this account. The account was closed in January, 2012, and SALEM is informed and believes that CHAO took all of the monies for her personal use.

//
//
//

## FIRST CAUSE OF ACTION

### (Violations of 11 U.S.C. § 523(a)(2)(A))

28. Paragraphs 1 through 27 are incorporated by this reference as fully as though set forth at length herein.

29. Based on the conduct described in the foregoing paragraphs, CHAO has engaged in conduct amounting to those recognized as nondischargeable under 11. U.S.C. § 523(a)(2)(A). Accordingly, any debts to SALEM arising from said conduct should not be discharged.

## SECOND CAUSE OF ACTION

### (Violations of 11 U.S.C. § 523(a)(4))

30. Paragraphs 1 through 29 are incorporated by this reference as fully as though set forth at length herein.

31. Based on the conduct described in the foregoing paragraphs, CHAO has engaged in conduct amounting to those recognized as nondischargeable under 11. U.S.C. § 523(a)(4). Accordingly, any debts to SALEM arising from said conduct should not be discharged.

WHEREFORE, Plaintiffs prey this Court determine as follows:

1. Grant judgment in favor of the Plaintiffs and against defendant in an amount to be ascertained at trial, but no less than the sum of $426,805.38 to A. Salem, D.D.S., Inc. no less than the sum of $730,000.00 to Ardeshir Salem, as well as any damages or amounts representing SALEM's lost investment opportunities and the significant tax liabilities SALEM incurred, plus statutory interest and the reasonable costs of obtaining restitution, including but not limited to costs of accounting and attorneys fees as allowed by law or statute;

2. Hold the debt nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and or (4);

3. Grant any other relief, including injunctive relief to protect the interests of the Plaintiffs.

Dated: March 10, 2016

Respectfully Submitted,

**PAGKAS & D'ANJOU, LLP**

/S/ Christopher J. D'Anjou
_____
Christopher J. D'Anjou
Attorneys for Creditors/Plaintiffs
ARDESHIR SALEM and A. SALEM,
D.D.S., INC.